# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **RAMON SERNA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | **SA-06-CV-1114 FB (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO:    Hon. Fred Biery**
**United States District Judge**

## I. Introduction

Plaintiff Ramon Serna brought this action for judicial review of the final decision of the Commissioner of the Social Security Administration (the Commissioner), determining that Serna was not disabled for the purposes of the Social Security Act (the Act) and denying Serna's applications for Disability Income Benefits (DIB) and Supplemental Social Security Insurance (SSI) benefits.  Serna asks the district court to reverse the decision and to render judgment in his favor.  In the alternative, Serna asks the district court to reverse the decision and remand the case for further proceedings.

After considering Serna's brief in support of his complaint,[1] the brief in support of the Commissioner's decision,[2] Serna's reply brief,[3] the record of the SSA proceedings, the pleadings

---

[1]Docket entry # 12.

[2]Docket entry # 14.

[3]Docket entry # 19.

on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this memorandum and recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring for disposition by recommendation all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's application for benefits.[4]

## II. Jurisdiction

The district court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Based on the record in this case, Serna exhausted his administrative remedies prior to filing this action in federal court.  Serna applied for DIB and SSI on November 3, 2003, alleging disability beginning August 14, 2002.[5]  The Commissioner denied the application initially and on reconsideration.[6]  Serna then asked for a hearing before an ALJ.[7]  A hearing was held before an ALJ on September 8, 2005.[8]  The ALJ issued a decision on March 1, 2006, concluding that Serna was not disabled within the meaning of the Act.[9]  Serna asked for review of the decision on

---

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]SSA record, pp. 63 & 324.

[6]*Id*. at pp. 32, 34, 326-7 & 334.

[7]*Id*. at p. 49.

[8]*Id*. at pp. 348-81.

[9]*Id*. at p. 16.

March 28, 2006.[10]  The SSA Appeals Council denied the request for review on November 13,

2006 after determining that no basis existed for reviewing the ALJ's decision.[11]  The ALJ's

decision became the final decision of the Commissioner for the purpose of the district court's

review pursuant to 42 U.S.C. § 405(g).  Serna filed this action seeking review of the

Commissioner's decision on December 20, 2006.[12]

### IV.  Issue Presented

> Is the ALJ's decision that Serna is not disabled supported by
> substantial evidence and does the decision comport with relevant
> legal standards?

### V.  Analysis

**A. Standard of Review**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court

is limited to determining whether substantial evidence supports the decision and whether the

Commissioner applied the proper legal standards in evaluating the evidence.[13]  "Substantial

evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."[14]  Substantial evidence

"must do more than create a suspicion of the existence of the fact to be established, but 'no

substantial evidence' will be found only where there is a 'conspicuous absence of credible

---

[10]*Id*. at p. 14.

[11]*Id*. at p. 6.

[12]*See* Serna's complaint, docket entry # 3.

[13]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[14]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

choices' or 'no contrary medical evidence.'"[15]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[16]   In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[17]   Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[18]   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[19]

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive DIB benefits.[20]   The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[15]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[16]*Martinez*, 64 F.3d at 173.

[17]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[18]*Martinez*, 64 F.3d at 174.

[19]*Id*.

[20]42 U.S.C. § 1382(a)(1) & (2).

result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[21]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[22]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[23]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[24]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[25]  If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience.[26]  The second step involves determining whether the claimant's impairment is severe.[27]  If it is not severe, the claimant is

---

[21]42 U.S.C. § 1382c(a)(3)(A).

[22]42 U.S.C. § 1382c(a)(3)(B).

[23]20 C.F.R. §§ 404.1520 and 416.920.

[24]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[25]20 C.F.R. §§ 404.1520 and 416.920.

[26]*Id*.

[27]*Id*.

deemed not disabled.[28]  In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[29]  If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience.[30]  If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work.[31]  If the claimant is still able to do his past work, the claimant is not disabled.[32]  If the claimant cannot perform his past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities, age, education, and work experience, to do other work.[33]  If the claimant cannot do other work, he will be found disabled.  The claimant bears the burden of proof at the first four steps of the sequential analysis.[34]  Once the claimant has shown that he is unable to perform his or her previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account his exertional and nonexertional limitations, able to maintain for a significant period of time.[35]  If the Commissioner adequately points to potential alternative employment, the

---

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]*Leggett*, 67 F.3d at 564.

[35]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

burden shifts back to the claimant to prove that he is unable to perform the alternative work.[36]

**B. Findings and Conclusions of the ALJ**

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At step 1, the ALJ determined that Serna had not engaged in substantial gainful activity during time relevant to the decision.  Although Serna alleged an onset date of August 14, 2002, he continued working until January 13, 2003.  But because Serna had not engaged in substantial gainful activity since that time, the ALJ proceeded to step 2.[37]  At Step 2, the ALJ determined that Serna was impaired by cervical and lumbar disc pathology and degenerative joint disease in multiple joints.  The ALJ characterized these impairments as severe.[38]  At step 3, the ALJ determined that these impairments are not severe enough to meet, medically equal or functionally equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Appendix 1), specifically ruling out section 1.02 (major dysfunction of a joint(s) due to any cause) and section 1.04 disorders of the spine).[39]  At step four, the ALJ determined that Serna can perform a wide range of light work.[40]  The ALJ found that Serna can lift/carry 10 pounds frequently and 20 pounds occasionally; sit up to 90 minutes at a time and work 6 hours in a work day; and stand/walk up to 60 minutes at a time and 6 hours in a work day.[41]  The ALJ also found that Serna should not

---

[36]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[37]SSA record, p. 4.

[38]*Id*. at p. 25.

[39]*Id*.

[40]*Id*.

[41]*Id*.

work around industrial vibration, temperature extremes, dampness, heights, or ladders, and that he should kneel, crawl or squat on only an occasional basis.[42]  Based on this residual functional capacity, the ALJ found that Serna cannot perform his past relevant work as an oil rigger, construction worker or cabinet maker because those jobs require a greater exertional level than Serna currently possesses.[43]  In step 5, the ALJ found that Serna's illiteracy and inability to communicate in English prevented direct application of the SSA's grid rules, or Medical-Vocational Guidelines,[44] so the ALJ consulted a vocational expert.[45]  During Serna's hearing, the vocational expert testified that a person with Serna's limitations can perform jobs which exist in significant numbers in the economy–specifically, cleaner-housekeeping with more than 1 million jobs nationally and 150,000 jobs regionally; laundry folder with 275,000 jobs nationally and 30,000 regionally; and hand assembler with more than 110,000 nationally and 10,000 regionally.[46]  Consequently, the ALJ determined that Serna can make a successful adjustment to other work that exists in significant numbers in the national economy and concluded that Serna is not disabled under the Act.[47]

**C.  Serna's Allegations of Error**

Serna doesn't specifically challenge the ALJ's determinations at any of the five steps, but

---

[42]*Id.*

[43]*Id.* at p. 27.

[44]20 C.F.R. pt. 404, subpt. P, appx. 2.

[45]SSA record, p. 27.

[46]*Id.* at p. 28.

[47]*Id.*

indirectly challenges the ALJ's step 4 determination about his residual functional capacity.  Serna maintains that ALJ erred in evaluating his credibility about the intensity, duration and limiting effects of his symptoms.  Serna suggests that the ALJ failed to comply with Social Security Regulation 96-7p which explains how the agency evaluates a claimant's statements about his symptoms.  Serna maintains that the ALJ's determination about his credibility is not supported by substantial evidence.

Serna maintains that pain in his shoulders, ribs, hips, legs and lower back pain prevent him from performing any substantial gainful activity.[48]  Serna described his pain as severe, constant, and continuous, aggravated by any type of physical activity and alleviated only by pain medication.[49]  The ALJ determined that Serna's complaints about pain are not supported by objective medical evidence to the extent alleged.[50]  Because a credibility determination is an issue of fact before the ALJ,[51] the district court must determine whether substantial evidence supports the ALJ's credibility finding.

In determining whether a claimant is disabled, the SSA considers all of the claimant's symptoms, including pain, and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.[52]  Other evidence includes

---

[48]*Id*. at pp. 84, 91, 110 & 112.

[49]*Id*.

[50]*Id*. at 25.

[51]"In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true." Social Security Reg. 96-7p, *available at* www.ssa.gov.

[52]20 C.F.R. § 404.1529.

the claimant's own statements, statements from the claimant's treating or nontreating physician, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairment(s) and any related symptoms affect her ability to work.[53]   Statements about pain alone do not establish disability—"there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of . . . pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled."[54]

When a claimant complains about pain, the SSA's regulations require the ALJ to first determine whether "an underlying medically determinable physical or mental impairment(s) [exists] . . . that could reasonably be expected to produce the individual's pain. . . ."[55]   If such an impairment exists, the ALJ must then "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."[56]   In considering pain, the SSA considers the objective medical evidence and the factors listed in 20 C.F.R. § 404.1529(c)(3).   Those factors are shown below:

---

[53]*See id.*

[54]*Id.*

[55]Social Security Reg. 96-7p, *available* at www.ssa.gov.

[56]*Id.*

(I) the claimant's daily activities;

(ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(iii) precipitating and aggravating factors;

(iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

(v) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

(vi) any measures the claimant uses or has used to relieve pain; and

(vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.[57]

Although the ALJ did not specifically address each of these factors in his opinion, specific consideration supports the ALJ's determination that Serna's allegations of pain are credible only to the extent that he is limited to light work.

Daily activities:  When Serna first applied for benefits, he described his daily activities as showering, cleaning the house, throwing out the trash, washing dishes, sweeping and mopping.[58] He also reported taking short walks during the day.[59]  He indicated that he spent three-fourths of the day in bed.[60]  In May 2004, Serna reported that he lives with his sister and her husband in a trailer and that he rests in a chair and lies down when the pain is intolerable.[61]  During his hearing

---

[57]*See* 20 C.F.R. § 404.1529.

[58]SSA record, p. 101.

[59]*Id*. at p. 101.

[60]*Id*. at p. 91.

[61]*Id*. at p. 110.

in September 2005, Serna testified that he spends his days sitting, standing, laying down, walking a little and watching television.[62]  He testified that he did not do any housework or yard work.[63]

Location, duration, frequency, and intensity of pain:  When Serna applied for benefits in November 2003, he complained about pain in his shoulder, ribs, hips, lower back and legs.[64]  He explained that he felt constant pain from his shoulder down to his legs and maintained that he was unable to do any activity that takes physical strength.[65]  He stated that he ceased working in January 2003 because he could not meet the physical demands of his job as a cabinet-maker.[66]  In September 2005, Serna testified that he is unable to work because he is bothered by pain in his neck, lower back, waist and legs, and because "he cannott last very long."[67]  He further testified that he can stand for 15 minutes before changing positions and sit for about 20 minutes before he needs to get up to change positions.[68]  He testified that he can walk about one block.[69]

Precipitating and aggravating factors:  In November 2003, Serna complained that there was nothing he can do that doesn't bring about pain throughout his body.[70]  He stated that excessive

---

[62]*Id*. at p. 358.

[63]*Id*. at p. 358.

[64]*Id*. at p. 84.

[65]*Id*.  *See also id*. at p. 110.

[66]*Id*. at p. 84.

[67]*Id*. at pp. 356 & 359.

[68]*Id*. at p. 355.

[69]*Id*. at p. 357.

[70]*Id*. at p. 101.

movement in his legs and hips, frequent walking, bending, lifting, and long-term standing and sitting aggravate his physical problems.[71]   The next month, he stated that he didn't know what makes his pain worse.[72]   He stated that he feels pain suddenly and unexpectedly.[73]   He said his pain worsens when he watches television or moves.[74]   In May 2004, he indicated that all physical activity makes his pain worse—standing, walking, bending, sitting for one to two hours.[75]

Type, dosage, effectiveness, and side effects of any medication to alleviate pain:  On the daily activity questionnaire that Serna completed in December 2003, shortly after he applied for benefits, Serna indicated that he takes medication for pain and spasms.[76]   He reported that he takes Vicodin,[77] Nortriptyline,[78] and Vioxx.[79]   He indicated that the medications make him drowsy, dizzy and weak.[80]   In May 2004, Serna stated that pain medication made his physical

---

[71]*Id*. at p. 101.

[72]*Id*. at p. 94.

[73]*Id*. at p. 94.

[74]*Id*. at p. 94.

[75]*Id*. at p. 110.

[76]*Id*. at p. 101.

[77]Vicodin is used for moderate to moderately severe pain.  *See* J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. V-1928 (Matthew Bender 2005).

[78]Nortriptyline hydrochloride is an anti-depressant.  *See* AM. SOC'Y OF HEALTH–SYS. PHARMACISTS, AHFS DRUG INFO. 2210 (2002).

[79]*Id*. at p. 97.  Vioxx is a used to treat osteoarthritis.  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. V-2775 (Matthew Bender 2005).

[80]SSA record, p. 99.

problems better.[81]  During his hearing, Serna testified that he takes Durabac—a medicine used to relieve mild to moderate pain, Hydrocodone—a medicine used to relieve moderate to moderately severe pain, and Temazapam—a sleeping aid.[82]

Treatment, other than medication, for relief of pain:  Serna receives no treatment for his shoulder, ribs, hips, lower back and legs, except for pain medication.  At his hearing, Serna testified that he sees only the physician assistant who prescribes his pain medication.[83]

Measures used to relieve pain:  Serna indicated that bed rest sometimes helps his pain.[84]

Other factors concerning Serna's functional limitations and restrictions due to pain:  Serna maintains that he can do nothing due to pain.

Despite these allegations of pain, Serna's medical records do not document any injury or condition that accounts for the alleged level of pain.  Serna's medical records consist of little before he sought disability benefits.  Before he applied for disability benefits, Serna's medical records document only the amputation of the tip of Serna's left thumb in a 2001 table-saw accident[85] and the removal of his gallbladder in early November 2003.[86]  Serna does not rely on these incidents to support his allegation of disability.  Other than that, the record contains what appears to be Serna's first doctor's visit for maladies that he relies on for his allegation of

---

[81]*Id*. at p. 110.

[82]*Id*. at p. 360.

[83]*Id*.

[84]*Id*. at p. 101.

[85]*Id*. at pp. 182-8.

[86]*See id*. at pp. 120-8 & 163-80.

disability.  Beginning in September 2003—over one year after Serna's alleged onset date and

eight months after he stopped working—Serna sought treatment at the McKenna Neighborhood

Health Center.[87]  At that time, he complained about pain in his hip, legs, lower and upper back,

ribs, neck, shoulders and headaches.[88]  Serna began seeing physician's assistant David Patten

who prescribed a variety of pain medications.  On January 12, 2004, Mr. Patten ordered four sets

of X-rays: lumbar spine, pelvis, left hip and left femur.  The X-ray of Serna's lumbar spine

showed a normal alignment of the vertebral bodies, no fractures or destructive lesions, disc

spaces normal in height, unremarkable paraspinous soft tissues, normal sacroiliac joints, an

asymmetric widening of the left sacroiliac joint, and an apparent ankylosis[89] of right sacroiliac

joint that the radiologist speculated was the result of a 1984 injury.[90]  The radiologist's overall

impression was a normal lumbar spine and abnormal sacroiliac joints.[91]  "The sacroiliac joints

serve as junctures between the sacrum and the ilium—the broad, flaring section of the pelvic

bone.  Dislocation of the sacroiliac joints without fracture of the sacrum may occur when the

pelvis is fractured."[92]  According to Serna, he was hit by a car in 1984, breaking bones in his

hips, pelvis, and legs.  Although the SSA record does not contain any treatment records for these

--------

[87]*Id*. at 223.

[88]*Id*.

[89]An ankylosis is a stiffness of a joint.  *See* J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. A-7605 (Matthew Bender 2005).

[90]SSA record, pp. 139 & 229

[91]*Id*.

[92]ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES (Matthew Bender 2003), at vol.  2, § 34.06.

15

injuries, the X-ray of Serna's pelvis reflect healed fractures of both pubic rami.  "The 'rami' . . . are bony extensions from the body or main mass of the pubic bone."[93]  The X-ray also showed surgical changes in both iliac crests consistent with harvesting bone grafts and an ankylosis of the right sacroiliac joint.[94]  The radiologist opined that the left sacroiliac joint is probably normal in width as it is asymmetrically wide when compared to the right sacroiliac joint.[95]  The radiologist saw no evidence of acute fracture or bone destruction.[96]  The X-ray of Serna's left hip showed healed fractures of the pelvis and an intramedullary rod in the left femur.  An intramedullary rod is used to bring and hold together the ends of a fractured long bone by inserting a steel rod into the medullary (marrow) cavity.[97]  The radiologist opined that Serna's hip joint was normal, with post traumatic changes in the pelvis and femur.[98]  Finally, the X-ray of Serna's left femur showed a well-healed fracture of the proximal shaft of the left femur, with an intermedullary rod in place, and no acute fractures or destructive lesions.[99]  These X-ray results do not constitute medical signs and laboratory findings which show that Serna has medical impairments which could reasonably be expected to produce the alleged degree of pain and which, when considered with all of the other evidence, would lead to a conclusion that Serna wasdisabled.  Notably, Mr. Patten

---

[93]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. S-7591 (Matthew Bender 2005).

[94]SSA record, pp. 138 & 230.

[95]*Id*.

[96]*Id*.

[97]*See* J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. N-139 & I-3744 (Matthew Bender 2005).

[98]SSA record, pp. 137 & 231.

[99]*Id*. at pp 136 & 232.

16

prescribed no other treatment other than pain medication[100] until March 2004 when he ordered a

consult with an orthopaedic surgeon.

In the meantime—on January 20, 2004—Dr. Bob Bower examined Serna at the request of

the Texas Rehabilitation Commission.[101]  Dr. Bower—a neurologist—ordered additional X-rays.

The X-ray of Serna's left hip showed remodeling of the proximal left femur fracture.[102]

Remodeling is a "continued process occurring in bones even after the skeleton has been fully

formed.  It involves the resorption (a breaking down and removal) of existing bone and the

formation of new bone at the same site."[103]  The X-ray also showed the intramedullary rod.[104]

The radiologist opined that the rod was uncomplicated in appearance proximally.[105]  The X-ray of

Serna's lumbar spine showed a normal alignment, preserved vertebral body and intervertebral

disc space heights, minimal osteophytic ridging at L4-5 anteriorly at end plates at L4-5 anteriorly,

no spondylolysis[106] or spondylolisthesis, and normal sacroiliac joints.[107]  The radiologist's overall

---

[100]SSA record, pp. 213

[101]The TRC's Disability Determination Services "adjudicates Social Security disability claims in accordance with the Social Security Act."  *See* TEX. SERVICES: SUPP. TO THE 2000 BIENNIAL REP., TEX., COUNCIL FOR DEVELOPMENTAL DISABILITIES ¶ 1.5.1 (May 2000), *available at* www.txddc.state.tx.us, click on resources & then on biennial reports.

[102]SSA record, p. 133.

[103]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. R-1711 (Matthew Bender 2005).

[104]SSA record, pp. 133 & 195.

[105]*Id.*

[106]Spondylolisthesis is a "forward displacement or slipping of one of the bony segments of the spine (I. e., of a vertebra) over its fellow below, but usually the slipping of the fifth or last lumbar (loin) vertebra over the body of the sacrum (which see).  To visualize this, one may conceive the spine as a stack of coins or, better still, of tuna cans. The slipping of a coin or a can forward upon the one below represents a case of spondylolisthesis." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY

impression was minimal spondylolysis deformas.[108]  Spondylolysis is the disintegration of a vertebra.[109]  Dr. Bower speculated that Serna's shoulder pain could be degenerative in nature, although there was no evidence of arthritis.[110]  He also speculated that Serna's left hip pain could be caused by degenerative arthritis related to Serna's 1984 injury.  He further speculated that Serna's complaints about back pain that extended to the leg could be caused by lumbar stenosis or lumbosacral radiculopathy.  As the ALJ observed, Dr. Bower found no gross motor dysfunction, no visible atrophy,[111] and no evidence of crepitus,[112] effusion[113] or joint deformity.[114]  The results of the X-rays that Dr. Bower ordered and Dr. Bower's examination do not constitute medical signs and laboratory findings which show that Serna has medical impairments which could reasonably be expected to produce the alleged degree of pain and which, when considered

---

OF MED. S-5627 (Matthew Bender 2005).

[107]SSA record, pp. 132 & 194.

[108]*Id.*

[109]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. S-5632 (Matthew Bender 2005).

[110]SSA record, p. 193.

[111]Atrophy means a "wasting away, a withering, or a faulty growth of some part of the body, as of a limb, muscle, organ, tissue, etc."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. A-12178 (Matthew Bender 2005).

[112]Crepitus means "the characteristic sound produced when the two ends of a broken bone are rubbed together."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. CH-6748 (Matthew Bender 2005).

[113]Effusion refers to the escape of fluid from blood vessels, resulting in their entering a body cavity or a tissue.  *See* J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. S-2699 (Matthew Bender 2005).

[114]SSA record, p. 193.

with all of the other evidence, would lead to a conclusion that Serna was disabled.

The following month—in February 2004—Serna saw Dr. Dennis Ray—an orthopaedic surgeon—at Mr. Patten's referral.  Dr. Ray ordered MRIs of Serna's lumbar spine and cervical spine.  The MRI of Serna's lumbar spine showed mild disc desiccation at the L5-S1 level.[115] Desiccation is the "drying of a tissue as a means of destroying it."[116]  The MRI was otherwise unremarkable.[117]  The MRI of Serna's cervical spine showed that the disc space at the C2-C3 level is congenitally small and there is an apparent posterior fusion at that disc space.[118]  The MRI also showed a left paramedian[119] disc protrusion at the C3-C4 level which is causing no evidence of canal stenosis or direct neutral impingement.[120]  Despite these unremarkable results, Dr. Ray indicated in his treatment notes that he viewed Serna as a candidate for permanent social security disability benefits.[121]  Dr. Ray also indicated that Serna could not do manual labor and that he is impaired in overhead reaching, pushing and pulling.  A few months later—in June 2004—Dr. Ray wrote a letter to the disability examiner opining—contrary to the MRI results—that Serna's cervical and lumbar spin are deteriorating, and that the deterioration, along

---

[115]*Id*. at pp. 208 & 280.

[116]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. D-1863 (Matthew Bender 2005).

[117]SSA record, pp. 208 & 280.

[118]*Id*. at pp. 209 & 281.

[119]Paramedian means "[s]ituated near and extending parallel to the midline (of the body)."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. P-1467 (Matthew Bender 2005).

[120]SSA record, pp. 209 & 281.

[121]*Id*. at p. 205.

with his extensive injuries in 1984, contribute to Serna's disability.[122]   Dr. Ray stated that he felt

that Serna qualified for disability benefits.[123]   The ALJ correctly observed that Dr. Ray did not

complete a residual functional capacity assessment and that Dr. Ray's opinion that Serna is

disabled is inconsistent with his own findings of negative straight-leg raising, no neural deficits,

and no motor or sensory deficits.[124]   The ALJ was not required to give Dr. Ray's opinion that

Serna is disabled controlling weight for three reasons: (1) the opinion is not supported by Dr.

Ray's treatment notes, (2) the opinion is contradicted by the previously discussed medical

evidence, and (3) the decision of whether Serna is disabled lies with the Commissioner, not Dr.

Ray.  Without Dr. Ray's opinion, Dr. Ray's treatment notes do not constitute medical signs and

laboratory findings which show that Serna has medical impairments which could reasonably be

expected to produce the alleged degree of pain and which, when considered with all of the other

evidence, would lead to a conclusion that Serna disabled.

Serna complains that the ALJ's credibility determination was based in part on Serna's

lack of treatment in 2003 despite having ceased working in January of that year.  Serna suggests

that the ALJ erred by considering a lack of treatment without the benefit of his explanations

about why he did not receive treatment.[125]   Serna implies that he that he didn't seek treatment

because he is indigent.  There are at least three reasons this suggestion fails.  First, it isn't clear

that the ALJ did not consider Serna's indigence in considering why Serna did not receive

---

[122]*Id*. at p. 313.

[123]*Id*.

[124]*Id*. at p. 27.  *See id*. at p. 206.

[125]Docket entry # 12, p. 10.

treatment.  The ALJ's decision reflects a thorough consideration of the record, and the modest evidence that Serna relies on in this case,[126] was in the record.  Second, Serna had the burden of proof at step 4 of the disability determination process and offered no explanation for not seeking treatment earlier.  While Serna ultimately obtained indigent care services, the record does not reflect why Serna waited to seek out such service.  Nothing in the record reflects that Serna did not seek medical care when he stopped working because he was indigent.  Three, even without consideration of the lack of treatment when Serna stopped working—and the lack of treatment before he stopped working—the record does not contain medical signs and laboratory findings which show that Serna has medical impairments which could reasonably be expected to produce the alleged degree of pain and which, when considered with all of the other evidence, would lead to a conclusion that Serna was disabled.

Serna also faults the ALJ for considering "a perceived discrepancy between the August 2002 onset date alleged in Serna's application . . . and the date Serna actually stopped working."[127]  Serna suggests that he did not understand the consequences of alleging an onset date prior to the date he stopped working because he doesn't speak English and because he did not have an attorney when he applied for benefits.[128]  This reason fails for at least three reasons.  First, Serna's attorney did not amend Serna's onset date.  Serna was not represented by an

---

[126]*See* SSA record, p. 100 (Serna's December 2033 statement that he sought financial help to see a doctor); p. 222 (Mr. Patten's September 2003 treatment note that Serna had applied for charity care at McKenna Hospital); p. 319 (indigent care card which expired in May 2004); p. 320 (hospital February 2004 phone record reflecting Serna's insurance as indigent healthcare).

[127]Docket entry # 12, p. 11.

[128]*See id.*

attorney until the month prior to his hearing, but the attorney could have amended the alleged

onset date had the date been a mistake.  Although Serna may be unable to communicate in

English, he had the assistance of an interpreter during the hearing.  Second, Serna had the burden

at step 4.  Having been turned down for benefits twice before,[129] Serna would have been familiar

with the evaluation process.  Third, working until January 2003 is clearly inconsistent with

alleging disability beginning in August 2002.

Finally, Serna criticizes the ALJ's reliance on the testimony of the medical expert, Dr.

George Weilepp.  Dr. Weilepp—an orthopaedic surgeon—testified that although Serna has

lumbar spine disease and hip disease, those conditions could not be reasonably expected to cause

the type of pain that Serna complained about during the hearing.[130]  Serna maintains that the ALJ

relied too heavily on Dr. Weilepp's testimony without considering other required factors.  Serna

complains that the ALJ failed to address the consistency of his statements to treating physicians

and other medical care-givers with his testimony.  But the ALJ did not question the consistency

of Serna's allegations of pain.  Instead, he questioned the consistency of Serna's allegations with

objective medical evidence.  My discussion of the specific factors shows that Serna's allegations

about the frequency and severity of his pain is not supported by medical signs and laboratory

findings which show that Serna has medical impairments which could reasonably be expected to

produce the alleged degree of pain and which, when considered with all of the other evidence,

would lead to a conclusion that Serna disabled.

Substantial evidence supports the ALJ's credibility determination about Serna's

---

[129]SSA record, pp. 63 & 350.

[130]SSA record, p. 371.

allegations about pain.  The determination is supported by Serna's X-rays in January 2004, Dr. Bower's examination, Serna's MRI results in march 2004, Dr. Ray's treatment notes, and Dr. Weilepp's testimony.  No medical signs and laboratory findings show that Serna's impairments can reasonably be expected to produce such pain that Serna is unable to perform consistent with the ALJ's determination about Serna's residual functional capacity.

### VI.  Recommendation

Because substantial evidence supports the ALJ's decision that Serna is not disabled, I recommend that Serna's request for relief (docket entry # 3) be DENIED and that the Commissioner's decision denying Serna benefits be AFFIRMED.

### VII.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this memorandum and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this memorandum and recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the district court.[131]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in

---

[131]28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

this report shall bar the party from a *de novo* determination by the district court.[132]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this memorandum and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[133]

**SIGNED** on September 28, 2007.

*Nancy Stein Nowak*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[132]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[133]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).